**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

|  |  |
|---|---|
| MAYRLA BOQUIN,<br><br>               Plaintiff,<br><br>       v.<br><br>BOSTON SCIENTIFIC CORP.,<br><br>            Defendant. | **COMPLAINT AND<br>DEMAND FOR JURY TRIAL** |

**COMPLAINT**

COMES NOW Plaintiff MAYRLA BOQUIN (hereinafter "Plaintiff"), through her undersigned counsel, files this Complaint against Defendant Boston Scientific Corporation (hereinafter "Boston Scientific" or "Defendant"), and alleges as follows based on personal knowledge, investigation of counsel, and information and belief:

**NATURE OF THE CASE**

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's wrongful conduct in connection with the development, design, manufacture, marketing, distribution and selling of Defendants' Pelvic Mesh Product, the Advantage Fit Transvaginal Mid-Urethral Sling System ("the Advantage").

2.      Plaintiff, by her undersigned counsel, brings this action against Defendant related to the design, marketing, distribution and sale of Defendant's Advantage Fit Transvaginal Mid-Urethral Sling System. This action is for compensator, equitable, injunctive, and declaratory relief. Plaintiff is making the following allegations based upon her individual personal knowledge as to

1

her own acts, and upon information and belief, as well as upon her attorneys' investigative efforts as to Defendant's actions and misconduct, and alleges as follows:

## PARTIES

**Plaintiff**

3.      At all times referenced herein, Plaintiff was and is a citizen and resident of Kissimmee, Osceola County, in the State of Florida.

**Defendant**

4.      Boston Scientific Corporation is a Delaware corporation with its corporate headquarters in Massachusetts. All acts and omissions of Boston Scientific Corporation as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.    Boston Scientific Corporation's registered agent for service is Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendant is incorporated and has its principal place of business in states other than the state in which the named Plaintiff resides.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this District. Furthermore, Defendant sells, markets, and/or distributes its Pelvic Mesh Products within the state of Florida and this District.

## FACTUAL BACKGROUD

### Defendant's Pelvic Mesh Products

8.      By way of background, surgical mesh products have been used to repair abdominal hernias since the 1950s.  In the 1970s, gynecologists began using surgical mesh products that were designed for hernia and abdominal repair to surgically repair prolapsed organs.  In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of Pelvic Organ Prolapse ("POP") and Stress Urinary Incontinence ("SUI"). Manufacturers, including Boston Scientific, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and/or SUI.  Today, Boston Scientific sells pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Products manufactured by Defendants are considered Class II medical devices.

9.      Most mesh products on the market today can trace their lineage, in part, to Boston Scientific's ProteGen sling, approved by Federal Drug Administration ("FDA") in 1996. The ProteGen was cleared by the FDA using its "fast track" 501(k) clearance program which required neither clinical trials nor peer-reviewed studies. No formal review for safety or efficacy was required, and no formal review for safety or efficacy was ever conducted by Boston Scientific with regard to the ProteGen. Once Boston Scientific was able to show that the ProteGen sling was "substantially the same" as a previous device, the FDA cleared the ProteGen device for marketing.

10.     Due to numerous complaints of pain, infections and injuries associated with the ProteGen sling, Boston Scientific voluntarily recalled the sling in 1999. In recalling the Protogen, it has been reported that Boston Scientific claimed: "The use of the ProteGen in the treatment of female urinary incontinence is associated with a higher rate than expected of vaginal erosion and dehiscence and does not appear to function as intended."

3

11.     Boston Scientific's own acknowledgement of early safety failures of the ProteGen should have, at a minimum, signified to Boston Scientific of the need for subsequent clinical testing of future mesh products.

12.     Shortly after its voluntary recall of ProteGen, Boston Scientific began the development of the Advantage Transobturator Mid-Urethral Sling System ("Advantage") features Advantage™ mesh with either a curved or halo needle design. Collectively, the products are often referred to as a "kit."  The Advantage sling system is a Class II medical device.  Boston Scientific designed the Advantage sling system for treatment of SUI.

13.     SUI is a condition that occurs when urine leaks out with sudden pressure on the bladder and urethra, causing the sphincter muscles to open briefly. The pressure may be from sudden forceful activities such as exercise, laughing, coughing, sneezing, or sudden movements. Treatments include, but are not limited to, pelvic floor muscle exercises, vaginal pessary, urethral bulking agents, and retropubic colposuspension procedure whereby sutures are attached to the ligaments or bone to lift and support tissues near the bladder and upper urethra.

14.     As with its other Class II products, Boston Scientific sought and obtained FDA clearance to market the Advantage, under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. Boston Scientific's Advantage was cleared to market by the FDA on April 11, 2013 via 510(k), K020110.

15.     Again, Boston Scientific did not perform any human trials with the Advantage. Instead, it performed bench, biocompatibity and animal testing.

4

16.     Boston Scientific utilized the FDA's 501(k) clearance program and its Advantage was cleared by the FDA as a device that was "substantially the same" as Tension Free Vaginal Tape. The Advantage was cleared to market by FDA on April 11, 2013.

17.     The Advantage sling is made from polypropylene, which has a Material Safety Data Sheet ("MSDS") that contains a Medical Application Caution.  The Caution statement specifically warns "to not use this product in medical applications involving permanent implantation in the human body." Further, the polypropylene MSDS the manufacturer makes "no representation, promise, express warranty or implied warranty concerning the suitability of this material for use in implantation in the human body or in contact with body fluids or tissues."

18.     The polypropylene MSDS also includes a section titled "Incompatibility With Other Materials", which lists materials and substances – like peroxide – that polypropylene should not be exposed to because it may react and degrade.  The vaginal area, where the Advantage is implanted, contains bacteria that eats the starch made by cells that line the vagina, which creates acids and peroxides – thereby causing a breakdown, or degradation, of the mesh.  It can also cause the mesh to harden inside the body.

19.     In willful ignorance of the injuries women sustained as a result of the ProteGen sling and in willful ignorance of polypropylene manufacturer's caution statement and section on incompatibility with other materials, Boston Scientific performed no testing on humans to determine the Advantage's appropriateness or fitness for permanent implantation in the human body. Furthermore, Boston Scientific did not test the polypropylene in humans prior to market to determine whether it was safe.

20.     The Advantage, which is made polypropylene, is defectively designed to be implanted permanently in the human body to treat stress urinary incontinence in women, including Plaintiff.

21.     The defective design of the Advantage, namely its construction of polypropylene, elicits a chronic foreign body reaction in which white blood cells try to wall off the polypropylene from the rest of the body. The chronic foreign body reaction causes the scar tissue to wrap around the entire Advantage, which causes the Advantage to contract and shrink.  Contracture and shrinkage are inapposite to Boston Scientific's Directions of use, which represent that the mesh is tension free.

22.     The Advantage's defects consisting of degradation, contraction and shrinkage of the mesh cause serious medical problems when implanted in the human body, including but not limited to dyspareunia, difficulty with voiding, and significant pain.  Plaintiff currently suffers from catastrophic injuries such as groin pain, bleeding, vaginal pain, vaginal discharge, urge incontinence and urgency, poorly controlled bowels, exposed mesh and dyspareunia.

23.     Defendant knew or should have known about the Advantage's risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

24.     Defendant knew or should have known that the Advantage unreasonably exposed Plaintiff, and countless other women, to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

25.     The scientific evidence shows that the material from which the Advantage is made is biologically incompatible with human tissue and promotes a negative immune response in Plaintiff's body and in a large subset of the population implanted with the Advantage.

26.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

27.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Advantage is unreasonably susceptible to degradation and fragmentation inside the body.

28.     The Advantage was unreasonably susceptible to shrinkage and contraction inside Plaintiff's body. Defendants should have known of this serious risk and warned physicians and patients.

29.     The Advantage was unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

30.     To this day, the Advantage, along with Boston Scientific's other slings have been and continue to be marketed to the medical community and to patients as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

31.     A woman who elects to have her SUI surgically treated has several options.  SUI can be corrected through traditional abdominal surgery using sutures to attach the urethra to a

ligament in the pelvis (known as the "Burch procedure"). SUI can also be surgically addressed using synthetic materials placed under the urethra to provide support.

32.     Boston Scientific omitted and downplayed the risks, dangers, defects, and disadvantages of the Advantage, and advertised, promoted, marketed, sold and distributed the Advantage as safe medical device when Defendants knew or should have known that the Advantage was not safe for its intended purposes, and that the Advantage would cause, and did cause, serious medical problems. Plaintiff suffered and continues to suffer from catastrophic injuries such as lower quadrant pain, groin pain, vaginal discharge, granulation tissue, urge incontinence and urgency, poorly controlled bowels, exposed meh and dyspareunia.

33.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Advantage has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and has caused severe and irreversible injuries, conditions, and damage to Plaintiff.

34.     The specific nature of the Advantage defects include, but are not limited to, the following:

      a.    The use of polypropylene which, when implanted, cases immune reactions that result from such material, such as chronic foreign body reactions, scar tissue that wraps around the entire mesh;

      b.    Biomechanical issues with the design of the Advantage, including, but not limited to, the propensity of the Advantage to contract or shrink inside the body, which in turn causes the surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

      c.    The use and design of arms and anchors in the Advantage, which, when implanted, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

d.     The design of the Advantage uses a transvaginal approach, this placement makes it very difficult, if not impossible to remove if there are complications;

e.     The Advantage is to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

f.     The propensity of the Advantage for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

g.     The inelasticity of the Advantage, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

h.     The propensity of the Advantage for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

35.     The Advantage is also defective due to Boston Scientific's failure to adequately warn or instruct Plaintiff and her Physicians of subjects including, but not limited to, the following:

a.     The Advantage's propensities to contract, retract, and/or shrink inside the body;

b.     The Advantage's propensities for degradation, fragmentation and/or creep;

c.     The Advantage's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.     The frequency and manner of mesh erosion or extrusion;

e.     The risk of chronic inflammation resulting from the Advantage;

f.     The risk of chronic infections resulting from the Advantage;

g.     The risk of permanent vaginal or pelvic scarring as a result of the Products;

h.     The risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

i.     The need for corrective or revision surgery to adjust or remove the Advantage;

j.     The severity of complications that could arise as a result of implantation of the Advantage;

k.     The hazards associated with the Advantage;

l.     The Advantage's defects described herein;

m.     Treatment of stress urinary incontinence with the Advantage is no more effective than feasible available alternatives;

n.     Treatment of stress urinary incontinence with the Advantage exposes Plaintiff to greater risk than feasible available alternatives;

o.     Treatment of pelvic organ prolapse and stress urinary incontinence with the Advantage makes future surgical repair more difficult than feasible available alternatives;

p.     Use of the Advantage puts Plaintiff at greater risk of requiring additional surgery than feasible available alternatives;

q.     Removal of the Advantage due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.     Complete removal of the Advantage may not be possible and may not result in complete resolution of the complications, including pain.

36.    Boston Scientific under reported and continues to underreport information about the propensity of the Advantage to fail and cause injury and complications, and has made unfounded representations regarding the efficacy and safety of the Advantage through various means and media.

37.    Defendant failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Advantage.

38.    Defendant failed to design and establish a safe, effective procedure for removal of the Products, or to determine if a safe, effective procedure for removal of the Advantage exists.

39.     Feasible and suitable alternatives to the Advantage have existed at all times relevant that do not present the same frequency or severity of risks as do the Products.

40.     The Advantage were at all times utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

41.     Defendants knowingly provided incomplete and insufficient training and information to physicians regarding the use of the Products and the aftercare of patients implanted with the Products.

42.     The Product implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendants' possession, and in the condition directed by and expected by Defendants.

43.     The injuries, conditions, and complications suffered by Plaintiff and numerous women around the world who have been implanted with the Advantage include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain.

**Case-Specific Allegations**

44.     On or about August 22, 2013, at Florida Hospital in Kissimmee, Florida, Plaintiff underwent the implantation of Defendant's Pelvic Mesh Product, that being the Advantage Transvaginal Mid-Urethral Sling System, to treat stress urinary incontinence.

45.     Prior to Plaintiff's surgery, her physician, Benjamin Ryder, MD, as well Plaintiff, was exposed to the aforementioned advertising and marketing campaign directed by Defendants.

46.     Plaintiff and her physician, Zaid Fadhli, MD, either through direct promotional contact with Defendants' Sales Representatives, Lab Faculty, through word-of-mouth with other health care providers, and/or through promotional materials, received the information Defendant intended Plaintiff and her physician to receive and view, to wit: that the Advantage was safe and effective for use in the treatment of stress urinary incontinence.

47.     Plaintiff began experiencing severe and debilitating pain, infections and dyspareunia sometime after implant.

48.     Plaintiff sought medical care from her physicians due to complications and problems attributed to Defendants' Pelvic Mesh Products.

49.     As a direct and proximate result of the use of Defendants' Pelvic Mesh Product, the Advantage, Plaintiff suffered, and continues to suffer, serious bodily injury and harm including surgical excision of the Advantage on June 22, 2017.

50.     As a direct and proximate result of the use of the Defendant's Pelvic Mesh Products, that being the Advantage Transvaginal Mid-Urethral Sling System, Plaintiff incurred, and continues to incur, medical expenses to treat her injuries and condition.

51.     As a direct and proximate result of the use of the Defendant's Pelvic Mesh Products, that being the Advantage Transvaginal Mid-Urethral Sling System, Plaintiff continues to receive medical treatment and is anticipated to undergo further surgeries to remove more mesh.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

52.     Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

53.     Defendant had a duty to Plaintiff to use reasonable care in designing, marketing, labeling, packaging and selling the Advantage.

54.     Defendant breached its duty in failing to use reasonable care as described herein in designing, marketing, labeling, packaging and selling the Advantage. Defendant breached its aforementioned duty by, among other things:

a) Failing to design the Advantage so as to avoid an unreasonable risk of harm to Plaintiff, who was implanted with the Advantage;

b) Failing to use reasonable care in the testing of the Advantage so as to avoid an unreasonable risk of harm to Plaintiff, who was implanted with the Advantage;

a) Failing to use reasonable care in inspecting the Advantage so as to avoid an unreasonable risk of harm to Plaintiff, who was implanted with the Advantage;

b) Failing to use reasonable care in the training and instruction to physicians for the safe use of the Advantage;

c) Failing to use reasonable care in studying the Advantage to evaluate its safety and to determine the nature, magnitude, and frequency of serious, life threatening complications that were known or knowable; and

d) Otherwise negligently or carelessly designing, marketing, labeling, packaging and/or selling the Advantage.

55.     The reasons that Defendant's negligence caused the Advantage to be unreasonably dangerous and defective include, but are not limited to:

a.     The use of polypropylene which, when implanted, cases immune reactions that result from such material, such as chronic foreign body reactions, scar tissue that wraps around the entire mesh;

b.     Biomechanical issues with the design of the Advantage, including, but not limited to, the propensity of the Advantage to contract or shrink inside the body, which in turn causes the surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

c.     The use and design of arms and anchors in the Advantage, which, when implanted, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

13

d.  The design of the Advantage uses a transvaginal approach, this placement makes it very difficult, if not impossible to remove if there are complications;

e.  The Advantage is to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

f.  The propensity of the Advantage for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

g.  The inelasticity of the Advantage, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

h.  The propensity of the Advantage for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

56.  Defendant also negligently failed to warn or instruct Plaintiff and her Physician, Zaid Fadhli, MD, but not limited to, the following:

a)  The Advantage's propensities to contract, retract, and/or shrink inside the body;

b)  The Advantage's' propensities for degradation, fragmentation and/or creep;

c)  The Advantage's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d)  The rate and manner of mesh erosion or extrusion;

e)  The risk of chronic inflammation resulting from the Advantage;

f)  The risk of chronic infections resulting from the Advantage;

g)  The risk of permanent vaginal or pelvic scarring as a result of the Advantage;

h)  The risk of recurrent, intractable pelvic pain and other pain resulting from the Advantage;

i)  The need for corrective or revision surgery to adjust or remove the Advantage';

14

j)   The severity of complications that could arise as a result of implantation of the Advantage;

k)   Treatment of SUI with the Advantage is no more effective than feasible available alternatives;

l)   Treatment of SUI with the Advantage exposes patients to greater risk than feasible available alternatives;

m)  Treatment of SUI with the Advantage makes future surgical repair more difficult than feasible available alternatives;

n)   Use of the Advantage puts Plaintiff at greater risk of requiring additional surgery than feasible available alternatives;

o)   Removal of the Advantage due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

p)   Complete removal of the Advantage may not be possible and may not result in complete resolution of the complications, including pain.

57.    As a direct and proximate result of Defendant's negligence, stemming from the Advantage's unreasonably dangerous defects, Plaintiff has sustained permanent injury such as lower quadrant pain, groin pain, vaginal discharge, granulation tissue, urge incontinence, urinary urgency, poorly controlled bowels, exposed mesh and dyspareunia.

58.    Further and as result of Defendant's negligence, Plaintiff has experienced significant mental and physical pain and suffering, has undergone a revision surgery on June 22, 2017 and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

59.    Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

60.     The Advantage implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein with respect to its design. As previously stated, the Advantage's design defects include, but are not limited to: The use of polypropylene material in the Advantage and the immune reaction that results from such material, causing adverse reactions and injuries. The Advantage was defectively designed as follows:

a.     The use of polypropylene which, when implanted, cases immune reactions that result from such material, such as chronic foreign body reactions, scar tissue that wraps around the entire mesh;

b.     Biomechanical issues with the design of the Advantage, including, but not limited to, the propensity of the Advantage to contract or shrink inside the body, which in turn causes the surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

c.     The use and design of arms and anchors in the Advantage, which, when implanted, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

d.     The design of the Advantage uses a transvaginal approach, this placement makes it very difficult, if not impossible to remove if there are complications;

e.     The Advantage is to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

f.     The propensity of the Advantage for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

g.     The inelasticity of the Advantage, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

h.     The propensity of the Advantage for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time.

61.     The foregoing defects existed when the Advantage left Defendant's control and, as a direct and proximate result of the Advantage's defects, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo future medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

62.     The likelihood that the Advantage's propensities to contract, creep, shrink, and degrade would cause harm are very high, in part because of Boston Scientific's knowledge that slings can cause injuries as evidenced by their development and subsequent voluntary recall of its ProtoGen sling in 1999.

63.     The gravity of the harm, included but not limited to, lifelong and chronic pain, urge incontinence, bowel incontinence and dyspareunia, is far outweighed by the simple precaution of warning patients and physicians of the Advantages' propensities to contract, creep, shrink, and degrade in its Directions for Use.

64.     Defendant is strictly liable to Plaintiff for designing, marketing, labeling, packaging and selling a defective product.

## COUNT III: STRICT LIABILITY – FAILURE TO WARN

65.     Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

66.     The Advantage implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendant did not provide sufficient or adequate warnings regarding, among other subjects:

a)  The Advantage's propensities to contract, retract, and/or shrink inside the body;

b)  The Advantage's' propensities for degradation, fragmentation and/or creep;

c)  The Advantage's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d)  The rate and manner of mesh erosion or extrusion;

e)  The risk of chronic inflammation resulting from the Advantage;

f)  The risk of chronic infections resulting from the Advantage;

g)  The risk of permanent vaginal or pelvic scarring as a result of the Advantage;

h)  The risk of recurrent, intractable pelvic pain and other pain resulting from the Advantage;

i)  The need for corrective or revision surgery to adjust or remove the Advantage';

j)  The severity of complications that could arise as a result of implantation of the Advantage;

k)  Treatment of SUI with the Advantage is no more effective than feasible available alternatives;

l)  Treatment of SUI with the Advantage exposes patients to greater risk than feasible available alternatives;

m) Treatment of SUI with the Advantage makes future surgical repair more difficult than feasible available alternatives;

n)  Use of the Advantage puts Plaintiff at greater risk of requiring additional surgery than feasible available alternatives;

o)  Removal of the Advantage due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

p)  Complete removal of the Advantage may not be possible and may not result in complete resolution of the complications, including pain.

67.     Defendant did not provide any warnings of the preceding defects to Plaintiff nor to

Plaintiff's physician, Dr. Zaid Fadhli. A warning that includes information on the preceding

defects would have altered the prescribing physician's decisions and/or prescribing practices regarding the Advantage such that injury to plaintiff would have been avoided.

68.     As a direct and proximate result of the Advantage's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

69.     Defendant is strictly liable to Plaintiff for designing, marketing, labeling, packaging and selling a defective product.

## COUNT IV: BREACH OF EXPRESS WARRANTY

70.     Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

71.     Defendant made assurances as described herein to the general public, hospitals and health care professionals that the Products were safe and reasonably fit for their intended purposes.

72.     Plaintiff and/or her healthcare provider chose the Product based upon Defendant's warranties and representations as described herein regarding the safety and fitness of the Products.

73.     Plaintiff, individually and/or by and through her physician, reasonably relied upon Defendant's express warranties and guarantees that the Product was safe, merchantable, and reasonably fit for their intended purposes.

74.     Defendant breached these express warranties because the Product implanted in Plaintiff was unreasonably dangerous and defective as described herein and not as Defendant had represented.

75. Defendant's breach of its express warranties resulted in the implantation of an unreasonably dangerous and defective product in Plaintiff's body, placing Plaintiff's health and safety in jeopardy.

76. As a direct and proximate result of Defendant's breach of the aforementioned express warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT V: BREACH OF IMPLIED WARRANTY

77. Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

78. Defendant impliedly warranted that the Products were merchantable and were fit for the ordinary purposes for which they were intended.

79. When the Product was implanted in Plaintiff to treat her pelvic organ prolapse and/or stress urinary incontinence, the Product was being used for the ordinary purposes for which it was intended.

80. Plaintiff, individually and/or by and through her physician, relied upon Defendant's implied warranties of merchantability in consenting to have the Product implanted in her.

81. Defendant breached these implied warranties of merchantability because the Product implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted.

82.     Defendant's breach of their implied warranties resulted in the implantation of unreasonably dangerous and defective products in Plaintiff's body, placing Plaintiff's health and safety in jeopardy.

83.     As a direct and proximate result of Defendant's breach of the aforementioned implied warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VII: DISCOVERY RULE, TOLLING AND FRAUDULENT CONCEALMENT

84.     Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

85.     Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

86.     Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

87.     Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages, and their relationship to Defendant's Products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of

limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

88.     The running of the statute of limitations in this cause is tolled due to equitable tolling.  Defendant is estopped from asserting a statute of limitations defense due to Defendant's fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with the Products.  As a result of Defendant's fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant.

## COUNT V: PUNITIVE DAMAGES

89.     Plaintiff realleges and incorporates by reference each allegation contained in paragraphs 1-51 and further alleges as follows:

90.     Defendant sold its Advantage to Plaintiff's healthcare providers and other healthcare providers in the state of implantation and throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for implantation in the female pelvic area.

91.     Defendant sold the Advantage to Plaintiff, Plaintiff's, health care providers and other health care providers in the state of implantation and throughout the United States in spite of their knowledge that the Advantage can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

92.     Defendant ignored reports from patients and health care providers throughout the United States and elsewhere of the Advantage's failures to perform as intended, which lead to the

severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Advantage's designs or the processes by which the Products are manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Products as safe and effective.

93.     Defendant knew the Advantage was unreasonably dangerous in light of their risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Advantage, as well as other severe and personal injuries which were permanent and lasting in nature.

94.     Defendant withheld material information from the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Advantage.

95.     Defendant knew and recklessly disregarded the fact that the Advantage caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

96.     Defendant misstated and misrepresented data and continues to misrepresent data so as to minimize the perceived risk of injuries caused by the Advantage.

97.     Notwithstanding the foregoing, Defendant continues to aggressively market the Advantage to consumers, without disclosing the true risks associated with the Products.

98.     Defendant knew of the Advantage's defective and unreasonably dangerous nature but continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Advantage so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff.

99.     Defendant continued to conceal and/or fail to disclose to the public, including Plaintiff, the serious complications associated with the use of the Advantage to ensure continued and increased sales of the Advantage.

100.    Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment against the Defendant and requests compensatory damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

1. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health and medical care costs, together with interest and costs as provided by law;

2. Restitution and disgorgement of profits;

3. Reasonable attorneys' fees;

4. The costs of these proceedings;

5. All ascertainable economic damages

6. Punitive damages;

7. Such other and further relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury on all issues so triable.

DATED: June 17, 2021           Respectfully submitted,

Local Counsel

*/s/ Joseph Osborne*
Joseph Osborne, Esq.
Osborne & Francis PLLC
433 Plaza Real Blvd Ste. 271
Boca Raton, FL 33432
Tel: (561) 293-2600
Fax: (561) 923-8100
Email: josborne@realtoughlawyers.com
       rbell@realtoughlawyers.com
       dmonahan@realtoughlawyers.com

*/s/ Daniel C. Burke*
Daniel C. Burke, Esq.
*Pro Hac Vice to be Submitted*
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, New York 10016
Tel: (212) 779-1414
Fax: (212) 779-3218
Email: dburke@bernlieb.com
Email: dweck@bernlieb.com

*Attorneys for Plaintiff*